## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL A. PATTERSON,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| vs.  ) | Case No. 08-2060-EFM-DWB |
| ) | |
| GOODYEAR TIRE AND  ) | |
| RUBBER COMPANY,  ) | |
| ) | |
| Defendant.  ) | |
| _____  ) | |

## <u>MEMORANDUM AND ORDER</u>

On March 25, 2009, the parties appeared before this Court to present oral argument regarding the following motions:

1. Plaintiff's Motion to Compel Answers to Request for Productions (Doc. 45); Defendant's Memorandum in Opposition (Doc. 51).[1]

2. Plaintiff's Motion to Compel Answers to First Interrogatories and Request for Production of Documents and Things (Doc. 86); Defendant's Response (Doc. 102); Plaintiff's Reply (Doc. 108); and Defendant's Surreply (Doc. 117).

---

[1] Plaintiff did not file a reply and the time to do so has expired.  D. Kan. Rule 6.1(d)(1).

1

3.    Motion to Compel Answers to Second (Third)
       Request for Production of Documents (Doc. 96);
       Defendant's Response (Doc. 110); and Plaintiff's
       Reply (Doc. 114).

Having reviewed the submissions of the parties and having listened to their oral

arguments, the Court is prepared to rule on Plaintiff's three motions.

The issues encompassed in the discovery requests at issue involve a fair

amount of overlap.  As such, the Court will address the remaining discovery issues

through the following distinct categories of subject matter:  a) Plaintiff's

attendance and payroll records (Doc. 43-3, RFP Nos. 9, 11; Doc. 97-3, RFP Nos. 1,

and 2); b) personnel files and related documents of other individuals (including

alleged decision-makers) (Doc. 43-3, RFP Nos. 47, 50; Doc. 97-3, RFP Nos. 4, 5,

6); c) Defendant's policies, procedures, and training materials (Doc. 43-3, RFP

Nos. 19, 21, 42, 43);[2] and d) electronic media, policies, and information relating to

Defendant's IT department (Doc. 87-3, RFP Nos. 1, 2, 3).[3]  As discussed herein,

---

[2] Charts used by Plaintiff during the March 25, 2009, hearing listed RFP Nos. 43 and 44 as seeking this information.  The actual discovery documents, however, place these requests at Nos. 42 and 43, as does Plaintiff's brief.  (*See* Doc. 43-3, at 11; Doc. 43, at 13.)  The Court takes judicial notice that Plaintiff's oral argument at the hearing was in regard to RFP No. 42 rather than No. 44.

[3] The Court notes that Plaintiff's briefs discuss requests for production and interrogatories that were not addressed at the March 25, 2009, hearing.  (*See generally* Docs. 43, 87, 97.)  The only discovery requests about which Plaintiff provided oral argument at the hearing are those enumerated above.  (Doc. 43-3, RFP Nos. 9, 11, 19, 21, 42, 43, 47, 50; Doc. 87-3, RFP Nos. 1, 2, 3; Doc. 97-3, RFP Nos. 1, 2, 4, 5, 6.)  The Court thus deems that

Plaintiff's motions are **GRANTED in part** and **DENIED in part**.

### A.   Plaintiff's attendance and payroll records (Doc. 43-3, Plaintiff's RFP Nos. 9, 11; Doc. 97-3, Plaintiff's RFP Nos. 1, and 2)

Plaintiff's RFP No. 9 seeks his "complete salary and wage records, payroll records and W-2 forms for every year of his employment with Defendant. (Doc. 43-3, at 4.) RFP No. 11 seeks documents relating to his attendance record while employed by Defendant "including, but not limited to, time cards and computerized time sheets." (*Id.*) RFP No. 1 seeks copies of Plaintiff's "absentee reports" for 2004-2007 while RFP No. 2 seeks copies of his "call off reports" for 2001-2007.[4] (Doc. 97-3, at 2.)

Plaintiff has received all of the underlying handwritten attendance cards for the full term of his employment. (Doc. 51, at 8.) He contends, however, that there is testimony regarding potential inaccuracies contained on the front side of attendance cards generally.[5] Thus, Plaintiff requests that all other available

the remainder of the issues referenced in Plaintiff's motions to compel have been resolved and/or Plaintiff has waived his arguments regarding the same.

[4] Based on comments of counsel for both parties at the March 29, 2009, hearing, it is the Court's understanding that "call off reports" are often referred to by the parties as "gatehouse logs." The Court will use the latter term throughout the remainder of this Order.

[5] Defendant stated that the front side of these cards are kept by a secretary, while the back side is used by supervisors themselves. When issues arise requiring a conference with union representatives, Goodyear only takes action based on information on the back side of the cards.

computer records relating to his attendance be produced, such as the gatehouse logs and Accident and Sickness reports (also referred to as "clock cards" or "absentee reports").[6]  According to Plaintiff, both Bill King and Tony McCauley (individuals identified as decision-makers in this case) testified that such other records are used in determining disciplinary action because attendance cards are unreliable.  Defendant indicated that it has produced all existing attendance documents going back to 2006, including certain gatehouse logs.[7]

Plaintiff signed the relevant "last chance agreement" on April 20, 2006. (Doc. 51-2.)  A review of Plaintiff's Complaint indicates that he is bringing no legal claims regarding the validity or legitimacy of that agreement.   In the Court's opinion, it is therefore both improper and unnecessary to allow Plaintiff to litigate issues and events prior to his execution of the last chance agreement.  Thus, documentation relating to Plaintiff's payroll and/or attendance prior to April 20, 2006, is irrelevant to these proceedings and/or not reasonably calculated to lead to the discovery of admissible evidence.

---

[6]  *See* Doc. D00743, submitted by Plaintiff's counsel at the March 25, 2009, hearing.

[7]  *See* Doc. D01605, also submitted by Plaintiff's counsel.

4

Plaintiff further argues that Defendant should be subject to an adverse inference charge of spoliation of evidence to the extent Defendant states historical documents do not exist.  Plaintiff points to 29 C.F.R. § 1602.14, which requires the preservation of personnel or employment records for a period of one year after involuntary termination or until the "final disposition" of any resulting charge of discrimination.

Plaintiff has, however, failed to identify any documents that were improperly destroyed.  Although Plaintiff argues that the gatehouse logs were not preserved according to the federal regulation, the Court does not agree.

Defendant attested that gatehouse logs are automatically deleted by its computer system every 12 months on an on-going basis.  Defendant printed one gatehouse log regarding Plaintiff on June 12, 2007 (encompassing entries from May 29, 2006, to July 28, 2006, Doc. D01605), and another was printed on February 5, 2007 (including entries from July 31, 2006, to February 2, 2007).[8] Although Defendant concedes that these documents are no longer maintained on its computer system, it has preserved hard copies of the documents, which have been produced to Plaintiff.  The documents contain the relevant information regarding

_____

[8] Document labeled "Plaintiff's Exhibit L," submitted by Plaintiff's counsel at March 25, 2009, hearing.

Plaintiff going back to May 29, 2006, which is more than a year before Plaintiff filed his EEOC charge of discrimination on August 17, 2007. (Doc. 51-7.) There is no substantive evidence before the Court that the information encompassed on these two documents is incomplete. As such, the gatehouse logs maintained and produced by Defendant are in accordance with the federal regulation Plaintiff cites.

Further, before an adverse inference instruction will be given to a jury, there must be a showing of intentional destruction or bad faith on the part of the non-producing party. *Energy West Mining Co. v. Oliver*, 555 F.3d 1211, at n. 2 (10th Cir. 2009). Plaintiff has failed to make such a showing. The Court sees no evidence that the gatehouse logs were intentionally destroyed to keep them out of this litigation – especially considering defense counsel's uncontroverted attestation that the documents are automatically deleted by Defendant's computer system on an on-going basis.

**B.    Personnel Files of Other Individuals (Doc. 43-3, Plaintiff's RFP Nos. 47, 50; Doc. 97-3, Plaintiff's RFP Nos. 4, 5, 6)**.

Plaintiff's RFP No. 47 requests the "complete personnel file of Bill King," whom Plaintiff has identified as a decision-maker. (Doc. 43-3, at 13.) RFP No. 50 seeks all documents relating to any "performance evaluations or job reviews" King received during his employment with Defendant. (*Id*.)

Defendant objected to producing any documentation from King's personnel file that is unrelated to his performance (e.g. W-2 forms, HIPAA authorizations, etc.).  The Court agrees that only documentation relating to King's performance evaluations or discipline is discoverable, in addition to any agreements relating to the separation of his employment with Defendant.  All other documentation contained in King's "personnel file" is irrelevant to these proceedings and is not to be produced.  To the extent King's separation agreement has yet to be produced, Defendant is ordered to do so.

Defendant attests that it has produced King's performance evaluations in its possession (for 2001, 2002, and 2007).[9]  King himself apparently indicated that he received an evaluation for one other year but, according to Defendant, that evaluation has not been located.  Defendant is directed to make a concerted effort to locate this evaluation and produce the same.  If the document cannot be located, Defendant shall submit a sworn affidavit regarding the effort that was taken to locate the document.  Regardless, the Court is aware of no evidence that would support the drawing of a negative inference relating to the absence of this document.

---

[9]  Defendant indicated that it is not unusual that King was not evaluated in certain years as a result in differences in management.

Requests Nos. 4 and 5 ask for the "complete personnel file" of Tony McCauley and Mike Burns, respectively.  (Doc. 97-3, at 3.)  McCauley and Burns have also been identified as decision-makers by Plaintiff.  Defendant attested that it did not maintain "personnel files" for these individuals.  According to Defendant, McCauley did not generally receive written performance evaluations because he reported directly to the Director of HR, while the same was true for Burns because he reported directly to the Plant Manager.  Defendant stated that if "evaluations" of such higher-ranking employees happen at all, they occur only informally as a result of the "very discretionary" opinions of their supervisors.  Defendant did, however, indicate that separation of employment agreements were drafted for both McCauley and Burns, although Burns' executed his agreement while McCauley did not.

As with King, the Court holds that Defendant is ordered to produce any documentation relating to performance evaluations or discipline of McCauley and/or Burns as well as their separation agreements (regardless of whether the agreements were finalized and/or executed).  Other documentation relating to their employment is irrelevant to these proceedings and is not to be produced.

During the March 25, 2009, hearing, Defendant also referenced a "GEM screen," which the Court understands is a computer screen that provides a

8

summarized employment history of a particular employee.  Defendant is ordered to produce a print out of these screens for King, McCauley, and Burns, if available. To the extent the information on the screen includes information regarding these individuals' salaries/wages, benefits, medical information, home addresses, or other information of an innately personal nature, the same may be redacted.  If no such document exists for any of these three employees, Defendant is directed to provide an affidavit explaining why not and/or what efforts were taken to locate such a document.

Plaintiff's RFP No. 6 seeks the "complete personnel files" of 37 individuals listed in an exhibit to Defendant's response to Plaintiff's EEOC complaint.  (Doc. 97-9.)  According to Plaintiff, all 37 of these employees were disciplined for attendance issues.   Defendant clarified in it's brief that the exhibit was submitted to the EEOC in response to Plaintiff's charge of disparate treatment based on sex (which is not an issue in the present litigation), not because of alleged violations of the ADA or FMLA (which do remain at issue).  (*See* Doc. 110, at 6.)  Plaintiff argued at the hearing that regardless of why the document was compiled and submitted, it still lists similarly-situated employees with absentee issues, making their personnel files relevant.

The Court does not agree.  The Court fails to see the relevance of the

9

personnel files of employees who did not receive last chance agreements.  Rather, the Court finds that only employees who entered last chance agreements with Defendant would constitute an appropriate, similarly situated group.

Defendant has produced the personnel files of four individuals who received last chance agreements and whose employment was subsequently terminated for attendance issues.  This, however, is too narrow in the Court's opinion.  As such, Defendant is ordered to produce the personnel files of any of these 37 employees who entered into a last chance agreement with Defendant, regardless of whether or not the individual's employment was subsequently terminated.

### C. Defendant's Policies, Procedures, and Training Materials (Doc. 43-3, Plaintiff's RFP Nos. 19, 21, 42, 43)

Plaintiff's Request No. 19 seeks "supervisors manuals which were in effect at any time during plaintiff's employment with defendant."  (Doc. 43-3,a t 6.) Request No. 21 asks for documents relating to Defendant's "policies on discipline (progressive or otherwise), termination, salary increases, promotions and/or severance pay" in effect during Plaintiff's employment.  (Doc. 43-3, at 7.) Defendant stated that no such documents exist.  Rather, supervisors' decisions are guided by the union contract and "factory letters," all of which have been provided to Plaintiff according to Defendant.  Plaintiff discussed a progressive discipline "flow chart" given to Defendant's supervisors, which came into effect in 2005.

According to Plaintiff, Tony McCauley testified regarding its existence.  Defendant

has looked for the flow chart, but its efforts to date have been unsuccessful.  If such

a document exists, Defendant is ordered to produce it.  If it does not exist and/or

cannot be located, Defendant is required to provide a sworn affidavit addressing

whether such a document previously existed and, if so, what happened to it, and

what efforts were made to locate it.

Plaintiff also presented oral argument regarding RFP Nos. 42 and 43, which

requested documents relating to "any education or training in relation to FMLA,

ADA compliance" taken by Bill King or Tony McCauley from 1994 to 2007.

(Doc. 43-3, at 12.)  Defendant indicated that it has produced a "Power Point"

presentation given to employees during their orientation as well as a copy of the

ADA notice Defendant is required to post at its workplaces.

Defendant stated that the only other relevant document is a memorandum

drafted by in-house counsel regarding the ADA and provided to certain employees

for educational purposes.  Defendant argues that this document is protected by the

attorney-client privilege.  The Court does not agree.  To the extent the document

involves specific legal advice regarding a situation with a particular employee, the

document could be considered privileged.  However, it appears that the subject

document was merely drafted for general, instructional and/or educational

11

purposes.  Defendant has not met its burden of establishing all of the required elements that would entitle the subject document to either an attorney-client privilege or to work product protection, therefore Defendant is ordered to produce the same.

### D.    Defendant's Computer and Electronic Materials (Doc. 87-3, Plaintiff's RFP Nos. 1, 2, 3).

Plaintiff's Request No. 1 seeks Defendant's "policies, procedures and guidelines relating to Defendant's computers, computer systems, electronic data and electronic media . . ." (Doc. 87-3, at 15.)  More specifically, Plaintiff has agreed to limit the scope of this request to policies relating to employee use of company computers, "e-mail storage conventions," "electronic media deployment, allocation and maintenance procedures," and "personal or home computer usage for work-related activities." (*Id.*, at 15-16; Doc. 87, at 4.)  Request No. 2 asks for organizational charts for Defendants Information Technology department from January 1998 through June 2007.  (Doc. 87-3, at 16.)  Finally, Request No. 3 seeks "[b]ackup tapes containing e-mail and other electronic data related to this action from January 1998 to June 2007." (*Id.*)

The Court is concerned with the timing of the parties' discussion of these issues.  The Initial Order Regarding Planning and Scheduling was entered in this case on May 13, 2008.  That Order specifically stated that counsel for the parties

> should keep in mind that electronically stored
> information (ESI) was the subject of very significant
> amendments to Fed. R. Civ. P. 16, 26, 33, 34, 37, and 45
> that went into effect on December 1, 2006.  Therefore,
> prior to the Rule 26(f) planning conference, counsel
> should familiarize themselves with those amendments
> <u>and</u> review the ESI guidelines that are posted on this
> court's Internet website . . .
>
> As this court's ESI guidelines make clear, prior to the
> Rule 26(f) conference, counsel also should become
> knowledgeable about their clients' information
> management systems and their operation, including how
> the information is stored and retrieved.

(Doc. 4, at 1-2 (emphasis in original).)

Included in this District's ESI guidelines is a duty on a producing party to include ESI with its Rule 26(a)(1) initial disclosures.  Guidelines for Discovery of Electronically Stored Information (ESI), at ¶ 2, http://www.ksd.uscourts.gov/guidelines/electronicdiscoveryguidelines.pdf.  This requires a party and its counsel to review the party's ESI files, including current, back-up, archival, and legacy computer files.  Concurrently, the guidelines place a duty to notify on the requesting party, which requires a party seeking discovery of ESI to "notify the opposing party of that fact immediately, and, if known at the time of the Fed. R. Civ. P. 26(f) conference, [to] identify as clearly as possible the categories of information that may be sought."  *Id*., at ¶ 3.  The parties are also urged to reach an agreement regarding the scope of e-mail discovery, back-up

materials, and how to access costs incurred as a result of electronic discovery.  *Id*., at ¶ 4.

Based on the arguments made at the March 25, 2009, hearing, as well as those contained in the parties briefs, it is clear to the Court that the steps required by the ESI Guidelines did not occur.  Further, the Initial Scheduling Order entered in this case on July 14, 2008, omitted the standard discovery subparagraph (e) regarding ESI.  (*Compare* Doc. 9, at 4-5 *with* http://www.ksd.uscourts.gov/forms/wpforms/StdSchOrder.wpd, at 5.)  While this case was transferred to the undersigned Magistrate Judge after entry of the Scheduling Order, it appears to the Court that both parties neglected the issue of ESI from the outset of this litigation until Plaintiff served the Requests for Production at issue on August 7, 2008 (Doc. 87-2) – a mere three and a half months before discovery in this case was initially to have been completed (*see* Doc. 9, at 4.)  This is unacceptable.

It is also obvious to the Court that many of the materials Plaintiff is now seeking are contained on back-up tapes, if they are available at all.  (*See* Doc. 117-2.)  These issues come before the Court much too late in the process.  Had the parties complied with their duties under the District's ESI guidelines, many – if not all – of these issues could have been addressed in a much more timely fashion, if

14

not avoided altogether.  As such, the Court is very reluctant to intervene at this late date.

Defendant has, however, offered to search its back-up tapes for relevant e-mail on three specific dates – one in April 2006 relating to Plaintiff's "last chance" agreement, another in February 2007 relating to the termination of Plaintiff's employment, and a final date in August 2007 relating to Plaintiff's "Step 3" grievance hearing.[10]  Defendant is, therefore, ordered to search back-up tapes for Tony McCauley and Bill King on these three dates and employ the search terms "Michael," "Mike," and "Patterson."  The Court finds that this sampling is sufficient given that Plaintiff has provided nothing of substance to establish that he was the subject of any e-mail generated by Defendant's employees.[11]

Based on the information contained in the affidavit of Defendant's Director

---

[10]  At the March 25, 2009, hearing, Defendant explained that its back-up tapes are not retained indefinitely.  Defense counsel stated that tapes for the first of these two dates (April 2006 and February 2007) should be available because of a "hold" on electronic media entered in unrelated products liability litigation.  By August 2007 (the third date), this hold was no longer in effect.  Thus, it is possible that the back-up tapes may not be available. (Defendant has, however, produced Tony McCauley's hand-written notes from the Step 3 hearing.)  To the extent back-up tapes are not available for the August 2007 date (or either of the other dates), Defendant is instructed to submit an affidavit verifying the same and describing the steps that were taken to locate the tapes.

[11]  To the contrary, Bill King apparently testified that he does not think he composed or received e-mail regarding Plaintiff, while Tony McCauley was not questioned about this at his deposition.

of Corporate Information Technology, an attempt to restore server back-up tapes,

and prepare the information for discovery, for one identified user on one specific

date would require no more than 12 man hours of labor.  (Doc. 117-2, at 5-6.)  "To

search for e-mails for each additional user or for more than one day would multiply

the time and expense accordingly." (*Id*., at 6.)  Thus, attempting restore and

produce this information for two users on the three days offered by Defendant

would require, at most, 72 hours of labor.  Pursuant to this District's ESI

Guidelines, the Court finds that the estimated labor to conduct this search would

not be excessive or unduly burdensome.  As such, Defendant is directed to bear the

costs of this production.

     **IT IS THEREFORE ORDERED** that Plaintiff's three Motions to Compel

(Doc. 45, 86, and 96) are **GRANTED in part** and **DENIED in part** as set forth

more specifically above.  Any additional documents to be produced pursuant to

this Order shall be produced by **May 29, 2009**.  If the material from the back-up

tapes cannot be produced by that date, defense counsel shall so advise the Court

and shall provide a date by which they can be produced.

     **IT IS FURTHER ORDERED** that a telephone conference will be held on

**June 11, 2009 at 11:00 a.m.**, to discuss all final scheduling matters including the

date of a Pretrial Conference and the deadline for any dispositive motion.  The

court will place the call.

Dated at Wichita, Kansas, on this 23rd day of April, 2009.

  s/ Donald W. Bostwick    
DONALD W. BOSTWICK
United States Magistrate Judge
